UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                                    )
JOHN MABREY,                                        )
                                                    )          No. C05-1499RSL
                          Plaintiff,                )
          v.                                        )          MEMORANDUM OF DECISION
                                                    )
WIZARD FISHERIES, INC., *et al.*,                   )
                                                    )
                          Defendants.               )
_____)

## I.  INTRODUCTION

This matter was heard by the Court in a bench trial commencing on July 2, 2007 and concluding on July 9, 2007.  Plaintiff John Mabrey, a seaman, claims he sustained shoulder, knee, and carpel tunnel syndrome ("CTS") injuries during his service to the F/V WIZARD.  As a result, plaintiff seeks recovery of lost wages, loss of earning capacity, pain and suffering, and maintenance and cure under the Jones Act and the unseaworthiness doctrine.  This Court has admiralty jurisdiction over this matter under the Jones Act, 46 U.S.C. § 688, *et seq.* and general maritime law.  The Court has considered the evidence presented at trial, exhibits admitted into evidence, and the arguments of counsel.  Being fully advised, the Court now makes the following Findings of Fact and Conclusions of Law:

//

//

MEMORANDUM OF DECISION

## II.  FINDINGS OF FACT

1.  Beginning in 1991, plaintiff worked as a deck hand aboard the defendant vessel, the F/V WIZARD.  In 1995, plaintiff was promoted to "deck boss" and by 1996, plaintiff was acting as the WIZARD's engineer, which involved, among other things, taking care of the engines, winches and cranes.

2.  In November of 2003, while moving a crab sorting table on deck, plaintiff stepped through a cracked fir deck board on the WIZARD's top "false wood deck."  Plaintiff's leg went through the wood deck at an angle and his left knee struck a bolt.  Plaintiff's left leg, however, did not reach the metal sub-deck or bear any weight as a result of stepping through the board.

3.  Plaintiff testified that he injured his knee again "a few days later" when he fell through an unsecured hatch cover on deck, but the Court does not find this testimony credible based on the factors identified in 9th Circuit Jury Instruction 3.6.  None of the other WIZARD crew members observed this incident.  At his deposition, the WIZARD's first mate, Gary Soper, testified that he had no recollection of plaintiff falling through a hatch or re-injuring his knee.  See Exhibit 30 (Soper Dep.) 75:12-14; 76:9-11.  While on board, plaintiff also did not report the specific incident of falling through the hatch, and at trial Captain Colburn credibly testified that he had no knowledge of the hatch incident.  See Exhibit 29 (Colburn Dep.)  89:12-21.

4.  In May 2006, plaintiff had knee surgery to remove a partially torn meniscus, the cost was paid by defendants.  Based on the medical testimony at trial, however, the Court finds that the meniscus tear and the claimed injury to plaintiff's left knee were not caused by the November 2003 fall through the deck board.  At trial, Dr. Alfred Blue, Dr. James Green and Dr. Thomas Williamson-Kirkland credibly testified that a direct blow on a non-weight bearing injury of the type plaintiff experienced in November 2003 would not cause a tear in the meniscus.  Additionally, as Dr. Green testified, a May 22, 2007 Magnetic Resonance Imaging (MRI) report shows that plaintiff's right knee, which plaintiff did not injure in the November

MEMORANDUM OF DECISION

1   2003 fall, also has a torn meniscus.  <u>See</u> Exhibit 581.  Accordingly, the Court finds that the torn

2   meniscus in plaintiff's left knee was the result of degeneration unrelated to the November 2003

3   fall through the deck board on the WIZARD or plaintiff's service to the vessel.

4       5.  On January 8, 2004, plaintiff slipped on the stairs leading to the WIZARD's engine

5   room.  To break his fall, plaintiff grabbed the coaming surrounding the stairwell with his left

6   hand and dislocated his shoulder in the process.

7       6.  Although hotly contested at trial, based on the credible testimony at trial from Nick

8   Mauer, the Court finds that the WIZARD's crew was chopping herring for bait on deck before

9   the incident.  When the crew finished preparing bait, they hung wet and oily rain gear on hooks

10  on the wall adjacent to, and above the engine room stairs, causing water and fish oil to drip on

11  the stairs.  The crew hung the rain gear above the engine room stairs because the heat from the

12  engine room would dry the gear.  The gear room on the WIZARD was inadequate for this

13  purpose.

14      7.  Given the steep incline of the engine room stairs, the parties vigorously contested

15  whether it was proper to descend the stairs by facing them as if descending a ladder, or by facing

16  away from them, as if going down a normal staircase, or by going down them sideways.   The

17  closer mechanism on the door leading to the engine room did not function properly, and as a

18  result, the door had to be held open while plaintiff descended the first few steps of the engine

19  room stairs otherwise the force of the door would push him down the stairs.  Because of this,

20  plaintiff reasonably descended the stairs by going down them sideways, and the Court also finds

21  there is no governing rule indicating that plaintiff improperly descended the WIZARD's engine

22  room stairs in this manner.

23      8.  The treads and nosings of the engine room stairs are made of "pressed" diamond plate

24  steel (as opposed to "non-skid" diamond plate), which was worn at the time of plaintiff's fall.

25      9.  At trial, the parties' experts vigorously disputed whether the slip resistence of the

26  stairs' treads and nosings was adequate.  The Court finds that there are no design standards

MEMORANDUM OF DECISION
                                    -3-

1  directly applicable to the slip resistance of the stair treads or the overall design of the engine

2  room stairs.  But, given the presence of the fish oil and water from the wet rain gear, coupled

3  with the worn condition of the pressed diamond plate treads and nosings and malfunctioning

4  door closer mechanism, the stair was not safe on January 8, 2004 when plaintiff injured his

5  shoulder.  Evidence presented at trial shows that defendants should have known about this

6  unsafe condition and plaintiff could not have eliminated this condition.

7         10.  As a result of the fall on the engine room stairs on January 8, 2004, plaintiff has had

8  three surgeries to repair his shoulder.  Based on the trial testimony of Dr. David Musnick and

9  the designated deposition testimony of Dr. Matthew Meuier, the Court finds that plaintiff suffers

10 from chronic tendinitis as a result of his shoulder injuries and he is likely to have pain and

11 stiffness in his shoulder for the foreseeable future.  See Exhibit 61 (Meuier Dep.) at 35:6-11.  As

12 a result, plaintiff  is likely to continue to need medication, therapy, and possibly another

13 shoulder surgery to remedy his shoulder condition.  Based on Dr. Meuier's testimony, however,

14 the Court finds that it cannot forecast the cost of the shoulder surgery or medication and therapy

15 with any degree of certainty.  See id. at 59:12-60:15.

16        11.  In June 2006, more than a year-and-a-half after plaintiff stopped work on the

17 WIZARD, plaintiff was diagnosed with CTS.  See Exhibit 61 (Meuier Dep.) at 21:9-22:3.  The

18 Court finds, however, that credible testimony shows that plaintiff's CTS was not caused by his

19 work on the WIZARD.  Both Dr. Alfred Blue and Dr. James Green testified that plaintiff's CTS

20 was not caused by the work on the WIZARD.  Additionally, Dr. William Bowman testified in

21 his deposition that there was only a 10-15% chance that plaintiff's CTS was related to his work

22 on the WIZARD.  See Dkt. #126; (Bowman Dep.) at 35:15-17; Dkt #126; Exhibit 517 at 8.

23        12.  The Court finds that plaintiff's last day at work aboard the WIZARD was October

24 28, 2004, and he started work as reservation clerk at Point Loma Sport Fishing on May 17, 2007.

25 As a result of the shoulder injury and based on the testimony of defendants' expert Mr. Steven

26

MEMORANDUM OF DECISION

Hughes, plaintiff's lost wages for this period total **$150,212**.  This figure is composed of the losses calculated by Mr. Hughes of $43,466 for 2005, $61,509 for 2006, and $45,237 for losses in 2007.

13.  The Court finds that while plaintiff has lost the ability to work at sea in the fishing industry, despite his shoulder condition, plaintiff retains the capacity to work and is currently employed.  Defendant's expert, Mr. William Skilling, credibly testified that by 2011, plaintiff could earn approximately $43,000 a year in his current occupation as a reservations clerk, net of taxes and discounted to present value.  By 2011, Mr. Skilling testified that plaintiff's income as a reservations clerk would be equivalent to, or exceed the income he received as an engineer aboard the WIZARD, given the additional benefits he would receive as a clerk, the costs and taxes plaintiff incurred in his work on the WIZARD, and potential reductions to his future income because of changes in the crab fishing industry.  Taking these factors into account, and discounting the loss of earning capacity to present value, Mr. Skilling's testimony indicated that plaintiff's future lost earnings totaled approximately **$17,000**.

14.  Plaintiff has experienced physical injury, emotional injury, pain and suffering, loss of enjoyment of life, and other similar general damages, some of which will continue for the rest of his life as a result of the shoulder injury he sustained when falling on the engine room stairs aboard the WIZARD.  Based on all the evidence presented, the Court finds that an award of **$75,000** is appropriate for these damages.

## III.  CONCLUSIONS OF LAW

### A.    Jones Act Negligence and Unseaworthiness Doctrine

Under the Jones Act, the basis for a ship owner's liability is grounded in negligence; the mere fact of injury will not suffice.  The quantum of evidence necessary to support a finding of Jones Act negligence is less than that required for common law negligence:  "a seaman must demonstrate only that his employer's negligence played any part, even the slightest, in producing

1   his injury" to sustain a finding of liability.  <u>Ribitzki v. Canmar Reading & Bates, Ltd. P'ship</u>,

2   111 F.3d 658, 662 n.3 (9th Cir. 1993).  Nevertheless, plaintiff has the burden of establishing all

3   four elements of a Jones Act claim, namely duty, breach, notice, and causation.  <u>Id.</u> at 662;

4   <u>Havens v. F/T Polar Mist</u>, 996 F.2d 215, 218 (9th Cir. 1993).

5        Under the unseaworthiness doctrine, a shipowner has an absolute duty to furnish a

6   seaworthy ship.  <u>Ribitzki</u>, 111 F.3d at 664.  To establish a claim for unseaworthiness, plaintiff

7   must establish:  "(1) the warranty of seaworthiness extended to him and his duties; (2) his injury

8   was caused by a piece of the ship's equipment or an appurtenant appliance; (3) the equipment

9   used was not reasonably fit for its intended use; and (4) the unseaworthy condition proximately

10  caused his injuries."  <u>Id.</u>

11       Turning first to plaintiff's knee injury, although plaintiff has the benefit of a

12  "featherweight causation standard," plaintiff has not met his burden under the Jones Act to prove

13  that his knee injury was caused by the fall through the broken deck board in November 2003 or

14  through an open hatch cover a few days later.  <u>See</u> <u>Ribitzki</u>, 111 F.3d at 664.  Plaintiff has also

15  not met his burden of proof that his knee injury was proximately caused by the falls through the

16  deck and hatch cover under his general maritime claim that the WIZARD was unseaworthy.

17  Accordingly, the Court concludes that defendants are not liable for plaintiff's knee injury.

18       Turning next to plaintiff's shoulder injury, plaintiff has established by a preponderance of

19  the evidence that his shoulder injury was caused by defendants' negligence under the Jones Act

20  and by the unseaworthiness of the vessel.  Plaintiff's recovery for his shoulder injury is not

21  barred under the primary duty rule.  Under the primary duty rule, "a seaman-employee may not

22  recover from his employer for injuries caused by his own failure to perform a duty imposed on

23  him by his employment."  <u>Bernard v. Maersk Lines, Ltd.</u>, 22 F.3d 903, 905 (9th Cir. 1994)

24  (internal citation and quotation omitted).  Based on the Court's findings above, plaintiff did not

25  create the conditions leading to his injury nor could he have controlled or eliminated them.  The

26

MEMORANDUM OF DECISION

1    Court also concludes that plaintiff was not contributorily liable for his shoulder injury.

2          **B.      Maintenance and Cure**

3          Maritime law places on the shipowner the burden of paying maintenance (cost of room

4    and board that would have been provided had the seaman remained on the ship) and cure

5    (medical costs) if a seaman is injured or becomes ill while in the ship's service.  In order to

6    promote broad coverage and to avoid uncertainties regarding the right to maintenance and cure,

7    the Supreme Court has determined that if there are any ambiguities or doubts regarding a

8    shipowner's liability, they must be resolved in favor of the seaman.  Vaughan v. Atkinson, 369

9    U.S. 527, 532 (1962); Farrell v. United States, 336 U.S. 511, 516 (1949).  Unlike the Jones Act

10   and unseaworthiness doctrine, maintenance and cure is owed without regard to the employer's

11   fault or negligence.  Farrell, 336 U.S. at 515-516.

12         "A shipowner is liable to pay maintenance and cure until the point of maximum medical

13   cure, where it is probable that further treatment will result in no betterment of claimant's

14   condition.  Whether a seaman has reached maximum medical cure is a medical question."

15   Rashidi v. Am. President Lines, 96 F.3d 124, 128 (5th Cir. 1996) (internal citation omitted); see

16   Farrell, 336 U.S. at 517-19.

17         However, "[a] seaman whose illness or injury manifests after conclusion of his or her

18   employment with the shipowner is generally not entitled to recover for maintenance and cure

19   absent 'convincing proof of causal connection' between the injury or illness and the seaman's

20   service."  Wills v. Amerada Hess Corp., 379 F.3d 32, 52 (2d Cir. 2004); see also Nelson v.

21   Research Corp. for Univ. Haw., 805 F. Supp. 837, 853 (D. Haw. 1992) ("Where the illness has

22   not manifested itself until after a seaman has left the ship, the seaman must be able to offer

23   convincing proof of causal connection between the alleged injury and his service on the ship.")

24   (quotation and citation omitted); Brahms v. Moore-McCormack Lines, Inc., 133 F. Supp. 283,

25   286 (S.D.N.Y. 1955) (same).

26

MEMORANDUM OF DECISION

-7-

1    Based on this authority and the findings set forth above, the Court concludes that

2    defendant is liable to provide plaintiff with continuing maintenance at the contractual rate of $35

3    per day and cure for his shoulder injury because his shoulder injury has not reached maximum

4    medical cure.  Although plaintiff has requested liquidated sums for the cost of future medication,

5    treatment, and surgery for his shoulder, the precise amount of necessary future treatment and the

6    cost of this treatment is an unclear medical question at this time.  Accordingly, the Court does

7    not liquidate plaintiff's future maintenance and cure amounts but instead orders defendant to

8    provide continuing maintenance and cure for plaintiff's shoulder injury until his treating

9    physicians determine that plaintiff's shoulder has returned to health or attains a state from which

10   it will not get any better.

11    The Court concludes that plaintiff is not entitled to maintenance and cure for his CTS

12   injury because, as set forth in the findings above, plaintiff failed to offer convincing proof of a

13   causal connection between his CTS and his service on the WIZARD.  Finally, the Court also

14   concludes that plaintiff is not entitled to maintenance and cure for his knee because it was not

15   shown that the torn meniscus condition in his left knee was caused by his service to the vessel.

16   **C.    Prejudgment Interest**

17    In admiralty, an injured seaman is entitled to prejudgment interest not only on his fixed

18   costs, but also on the amount awarded for pain and suffering and any other intangible losses.

19   Prejudgment interest "must be awarded unless peculiar circumstances justify its denial."  Vance

20   v. Am. Haw. Cruises Lines, Inc., 789 F.2d 790, 795 (9th Cir. 1986).  The district court has

21   "discretion to award prejudgment interest to accomplish the just restitution of injured parties"

22   and "also has broad discretion to determine when prejudgment interest commences and what rate

23   of interest to apply."  Columbia Brick Works, Inc. v. Royal Ins. Co. of Am., 768 F.2d 1066,

24   1068 (9th Cir. 1985).  Normally, the interest rate prescribed for post-judgment interest in 28

25   U.S.C. § 1961(a) is applied unless the equities of the case demand a different rate.  See W. Pac.

26

MEMORANDUM OF DECISION

Fisheries, Inc. v. SS President Grant, 730 F.2d 1280, 1289 (9th Cir. 1984).  In this case, the Court concludes that prejudgment interest shall be applied at the federal statutory rate of 4.16% from plaintiff's last day of work on the WIZARD, October 28, 2004, until the date of this Memorandum of Decision.

## IV.  CONCLUSION

Based on the findings recited above and the Court's conclusions of law, the Court finds in favor of plaintiff on his claims of negligence and unseaworthiness for the shoulder injury sustained on January 8, 2004, and awards damages as follows:

| | |
|---|---|
| Past Wage Losses: | $ 150,212 |
| Pain and Suffering and Loss of Enjoyment of Life: | $  75,000 |
| Lost Earning Capacity | $  17,000 |
| Pre-Judgment Interest | $  29,848 |
| **TOTAL:** | **$ 272,060**[1] |

Plaintiff is also awarded continuing maintenance and cure for his shoulder injury consistent with the terms of this Memorandum of Decision.  The Clerk of Court is directed to enter judgment accordingly.

DATED this 30th day of August, 2007.

*Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

---

[1]  Based on the testimony of Eli Bjornoy, the Court finds that defendants have already paid $60,326.66 to plaintiff, which shall be offset against the total damages award.  See Exhibit 555; Dkt. #102.  Interest on the $60,326.66, at the rate prescribed for post-judgment interest in 28 U.S.C. § 1961(a), shall also be deducted from plaintiff's award.  Given that the $60,326.66 payment was spread over the period of August 3, 2004 to September 1, 2005 in varying amounts, the Court reserves the interest calculation for the parties.  See Exhibit 555.  Should the parties fail to reach agreement on appropriate interest for the $60,326.66 offset, the parties may file a joint submission, not to exceed four pages, for the Court's consideration.